# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WILLIAM DADDONO,
              Plaintiff

        v.

UNITED STATES OF AMERICA, DR.
BONNIE NOWAKOWSKI, and DR.
BRIJ MOHAN,
              Defendants

No. 16 CV 6418

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

The plaintiff, William Daddono, alleges claims under the Constitution against government officials (a "*Bivens*" action), and claims under the Federal Tort Claim Act, 28 U.S.C. § 1346. ("FTCA"). (R. 1.)[1] At summary judgment, three defendants remain: doctors Bonnie Nowakowski and Brij Mohan, sued in their individual capacities, (the "doctors"), against whom Daddono brings his *Bivens* claims, alleging that the doctors violated his Eighth Amendment rights by being deliberately indifferent to his medical condition, and the United States (the "government") (collectively "the defendants"), against whom Daddono brings his FTCA claims for medical negligence while he was detained and later incarcerated.

Before the Court is the defendants' motion for summary judgment, (R. 202), and Daddono's partial motion for summary judgment on the FTCA claim. (R. 209.) Daddono also moved to amend the complaint, (R. 225), which was taken under

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

advisement pending ruling on summary judgment. (R. 227.) For the reasons that follow, the Court grants the defendants' motion for summary judgment, denies Daddono's motion for summary judgment, and denies Daddono's motion to amend the complaint as moot.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case. Any fact not properly disputed is admitted. N.D. Ill. Local R. 56.1(e)(3).[3]

Daddono is a former federal inmate. He was first diagnosed with hepatitis C, a viral liver infection, in 2002 or 2003, prior to his incarceration. (Pl.'s Response to DSOF ¶ 3.) When he was first diagnosed, Daddono used the only available treatment for hepatitis C, but discontinued that treatment based on serious side effects. (Defs.' Resp. to PSOF ¶¶ 2–3.) Though using that treatment diminished Daddono's viral load significantly, it did not fully eradicate the hepatitis C virus. (*Id.* ¶¶ 4–5.)

---

[2] *See* LR 56.1 Statement of Material Facts In Support Of Defendants' Motion For Summary Judgment ("DSOF") (R. 203); Plaintiff's Local Rule 56.1 Response To Defendants' Statement ("Pl.'s Resp. to DSOF") (R. 210); Plaintiff's Local Rule 56.1 Statement Of Material Facts In Opposition To Defendants' Motion For Summary Judgment And In Support Of Plaintiff's Motion For Partial Summary Judgment ("PSOF") (R. 211); Defendants' Response To Plaintiff's Statement Of Facts ("Defs.' Resp. to PSOF") (R. 216); Defendant's L.R. 56.1(b)(3) Statement Of Additional Facts In Opposition To Plaintiff's Cross-Motion For Summary Judgment ("DSOAF") (R. 217); Plaintiff's Local Rule 56.1 Response To Defendants' Statement Of Additional Facts In Opposition To Plaintiff's Cross-Motion For Summary Judgment ("Pl.'s Resp. to DSOAF") (R. 221).

[3] In responding to the defendants' Statement of Facts, there are several instances where Daddono states that he does not dispute the accuracy of the quoted material without levying any other dispute. (*See generally*, Pl.'s Resp. to DSOF.) "An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission." *McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) (citations omitted). Therefore, the Court treats those facts as admitted.

In 2013, the Food and Drug Administration ("FDA") approved new "DAA" drugs that were "highly effective in treating hepatitis C and which initially cost around $90,000 to $100,000 per patient." (Pl.'s Resp. to DSOF ¶ 13.) The American Association for the Study of Liver Diseases ("AASLD") released guidance which initially allowed for prioritizing treatment. (*Id.* ¶ 14.) In October 2015, the AASLD "dropped" prioritization from the guidance. (*Id.*) The Bureau of Prisons ("BOP") published its own guidance in 2015 and 2016, relying on the recommendations of the AASLD. (*See* DSOF at 498, 542 ("Exhibit H" and "Exhibit I") (BOP guidance for treating hepatitis C, relying on AASLD guidelines); Pl.'s Resp. to DSOF ¶ 26 ("The team of physicians at the BOP's central office formulates BOP's clinical practice guidelines based on 'all subspecialty organization[.]'")) This guidance "maintained its practice of prioritization, due to its limited resources." (Pl.'s Resp. to DSOF ¶ 16.) Indeed, "[t]he limited resources that led the BOP to continue its practice of prioritization included both funding and availability of the medication," and the cost of the medication was "exorbitant." (*Id.* ¶¶ 17–18.)

The BOP's policies were meant to "ensure that the patients with the greatest need would receive the medication first." (*Id.* ¶ 19.) To accomplish this, the BOP initially used four priority levels, but later reduced it to three in October 2016. (*Id.* ¶ 28.) Priority 1 was the highest and in 2015 and 2016, DAA medication was provided solely to those rated as priority 1 or 2; priority 4 (and after October 2016, priority 3) was the lowest, and hepatitis C medication was not considered as a treatment option for those at that level. (*Id.* ¶¶ 76–79.) "All BOP treaters are required to follow the

3

BOP's hepatitis C guidelines." (*Id.* ¶ 81.) In addition, the United States Marshal Service ("Marshals") follows the BOP's hepatitis C guidelines. (*Id.* ¶ 22.)

From April 2015 through early October 2015, Daddono was in the Marshals' custody, primarily in Kankakee, Illinois. (Defs.' Resp. to PSOF ¶ 10.) While there, Daddono had labs taken, and underwent an abdomen ultrasound that showed "fatty replacement of the liver." (*Id.* ¶¶ 11–12.) In September 2015, Daddono expressed concern during a hearing in his criminal case about the "BOP's failure to provide treatment for his hepatitis C." (*Id.* ¶ 13.) Following this hearing, on September 22, 2015, Daddono saw an outside liver specialist for evaluation. (*Id.* ¶ 15.) The specialist, Dr. Reau, "opined that [Daddono] had a very high chance for viral eradication within 12 weeks" of receiving DAA medication, and that Daddono's "case required moderate to high severity care, and that his risk level was moderate." (*Id.* ¶ 17.)

After this appointment, a prisoner medical request, which referenced Reau's recommendation, was initiated. (*Id.* ¶ 18.) The medical request was denied because Daddono's results showed a "low likelihood of advanced liver disease" and patients in the Marshals' custody "are prioritized for consideration of [hepatitis C] treatment only when there is evidence of advanced liver disease by APRI score or liver biopsy, or other compelling indications for prioritization for expedited treatment" as specificized in the AASLD "current guidelines." (Pl.'s Resp. to DSOF ¶ 38 (citations omitted).) Dr. Wolf, the Marshals' medical director, reviewed this decision in advance of an upcoming hearing in Daddono's criminal case about his medical issues. (DSOF

4

at 665, 667 ("Exhibit P").) Wolf noted that Daddono's case was "a bit complicated" but agreed that denial was appropriate. (Pl.'s Resp. to DSOF ¶ 39.)

On October 21, 2015, Wolf wrote a letter to the Assistant United States Attorney handling Daddono's criminal case, explaining the decision. (Exhibit P at 667). Wolf also noted that by that point, Daddono had been transferred to a BOP facility (*id.*), discussed below. In addition, Wolf spoke with Reau by phone on October 23, 2015; Reau told Wolf that treatment was not urgent. (Pl.'s Resp. to DSOF ¶¶ 42–43.) Wolf changed the denial to a "deferral" of hepatitis C medication. (*Id.* ¶ 49.) During the entirety of Daddono's time with the Marshals, AASLD included prioritization in its hepatitis C treatment recommendations. (*Id.* ¶ 14 ("[O]n October 22, 2015, the organization 'dropped' the prioritization from its guidance.").)

As mentioned, at some point in October 2015, Daddono was transferred to the BOP's custody; once there, Daddono saw Dr. Nowakowski for a "baseline evaluation." (*Id.* ¶ 51.) During the evaluation, Daddono and Nowakowski discussed the BOP's guidance regarding prioritization for treatment. (*Id.* ¶ 54.) At that time, the BOP treated patients with hepatitis C by monitoring them and conducting lab tests every six months. (*Id.* ¶ 56.) The plan for Daddono was to have lab work done again so he and Nowakowski could discuss any trends and what information was needed to prioritize Daddono for treatment. (*Id.* ¶ 58.) Daddono had a follow-up visit in February 2016, where his liver test numbers showed they were "close to normal." (*Id.* ¶ 62.) This test, as well as the tests taken while Daddono was at Kankakee, indicated that he was at a "low risk" for advancement of his hepatitis C to fibrosis or cirrhosis.

(*Id.* ¶ 63.) The plan after this visit was to continue monitoring Daddono, with labs every six months. (*Id.* ¶ 65.) Daddono visited Nowakowski again in June 2016; he asked about hepatitis C treatment and was told by Nowakowski that they were "following the clinical practice guidelines, procedures to get approval." (*Id.* ¶ 70 (citations omitted).) Another visit between Nowakowski and Daddono occurred in September 2016. (*Id.* ¶ 72.) Daddono was still at a low risk for progression of the disease, (*id.* ¶ 73); "Nowakowski's assessment was that Daddono did not need hepatitis C treatment at the time." (*Id.* ¶ 97.) At some point, though it is not clear when, Dr. Mohan also met with Daddono to discuss the priority levels for treating hepatitis C; Mohan explained to Daddono that he would not receive the medication because Daddono was at the lowest priority level. (*Id.* ¶¶ 84–85.)

Daddono was then in IDOC custody to serve a state sentence from 2016 through 2018. (*Id.* ¶ 102.) He returned to federal custody in 2018. (*Id.* ¶ 103.) This time, Daddono was evaluated and diagnosed with cirrhosis; a request was submitted to treat Daddono with hepatitis C medication. (*Id.* ¶¶ 104–05.) That request was approved. (*Id.* ¶ 105.) However, starting treatment would have required Daddono to remain in custody for longer than necessary, so he declined the treatment, (*id.* ¶ 106.); he also declined the treatment because the medication would have forced him to stop taking other medications. (*Id.*)

Daddono was released from federal custody in 2019. (*Id.* ¶ 107.) Upon obtaining employment and health insurance, he completed a course of hepatitis C medication.

(*Id.* ¶ 108.) The medication "cleared the virus," but Daddono remained at risk for liver cancer and further cirrhosis. (*Id.* ¶¶ 109–10 (citations omitted).)

One of the new allegations in the proposed Fifth Amended Complaint is that as a result of the defendants' failure to treat his hepatitis C, Daddono developed liver cancer in March 2024. (R. 225-1 ¶¶ 76–78.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). If a reasonable jury, when viewing the record and all reasonable inferences drawn from it in the light most favorable to the nonmovant, could return a verdict for the nonmovant, then a genuine dispute of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the Court "construe[s] all facts and draw[s] all reasonable inferences in the nonmoving party's favor[.]" *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citations omitted). "Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017) (citing *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)).

## ANALYSIS

### I. BIVENS CLAIM

Daddono asserts a *Bivens* claim against the doctors. (R. 202 at 11.) In *Bivens v. Six Unknown Fed. Narcotics Agents*, the Supreme Court "authorized a damages action against federal officers for alleged violations of the Fourth Amendment." *Egbert v. Boule*, 596 U.S. 482, 486 (2022) (citing 403 U.S. 388 (1971)). Since then, the Supreme Court has extended the rationale of *Bivens* only twice more: to a Fifth Amendment sex-discrimination claim, *Davis v. Passman*, 442 U.S. 228 (1979), and a federal prisoner's Eighth Amendment claim for inadequate care, *Carlson v. Green*, 446 U.S. 14 (1980). *Egbert*, 596 U.S. at 490–91.

In the intervening years, the Supreme Court has shown reluctance to broaden the *Bivens* doctrine any further than it already has. The Supreme Court has "emphasized that recognizing a cause of action under *Bivens* is a 'disfavored judicial activity.'" *Id.* at 491 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)). "[T]he most important question is who should decide whether to provide for a damages remedy, Congress or the courts? If there is a rational reason to think the answer is 'Congress' . . . no *Bivens* action may lie." *Id.* at 492 (citations and quotations omitted).

To that end, whether a claim can be brought under *Bivens* is subject to a two-step analysis. *Id.* (citing *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020)). First, courts consider whether the underlying claim presents a "new *Bivens* context." *Sargeant v. Barfield*, 87 F.4th 358, 363 (7th Cir. 2023) (quoting *Ziglar*, 582 U.S. at 139). "A context is new if the claim is 'different in a meaningful way from previous *Bivens*

8

cases decided by [the Supreme] Court." *Id.* (citation omitted). Meaningful differences might include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to a problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 582 U.S. at 140. This is not an exhaustive list. *Id.* at 139. Put another way, "a difference is 'meaningful' when it involves a factual distinction or new legal issue that might alter the policy balance that initially justified the implied damages remedy in the *Bivens* trilogy." *Snowden v. Henning*, 72 F.4th 237, 239 (7th Cir. 2023).

If the court determines that the claim presents a new *Bivens* context, the analysis moves to step two. *Sargeant*, 87 F.4th at 363. The second question asks whether "special factors counsel[ ] hesitation against implying a remedy." *Id.* (quoting *Ziglar*, 582 U.S. at 136, 140 (quotations omitted) (alteration in original)). The heart of this inquiry is whether the "Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* (quoting *Hernandez*, 589 U.S. at 102). Overall, though the *Bivens* inquiry remains, for now, a two-step analysis, the Supreme Court has suggested that, in reality, whether *Bivens* can be extended boils down to one question:

"whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 492. And if "Congress has already provided, or has authorized the Executive to provide, an alternative remedial structure," then a *Bivens* remedy is unavailable. *Id.* at 493 (citations and quotations omitted).

With this landscape in mind, the Court turns to the parties' arguments.

### A.    New Bivens Context

The doctors move for summary judgment on the ground that *Bivens* liability is unavailable. (R. 202 at 13–14.) They argue that the facts here present a new *Bivens* context, and therefore the Court must consider whether any special factors counsel hesitation toward extending *Bivens*; the doctors contend that there are. (*See generally*, *id.* at 15–27.) In contrast, Daddono asserts that his case does not present a new *Bivens* context; rather, the facts in Daddono's view are "substantially similar" to the claims in *Carlson*, such that there is no new *Bivens* context. (R. 209 at 18.) Daddono does not address whether, if the Court determines that this a new *Bivens* context, any special factors apply that suggest extending *Bivens* would be inappropriate. Rather, according to Daddono, there "are no[ ] meaningful differences under the case law" that distinguish his case from *Carlson*, and thus summary judgment on this count should be denied.

In *Carlson*, "officials allegedly kept a prisoner in a subpar medical facility against the advice of doctors, failed to give him competent care for eight hours after an asthma attack, administered the wrong drugs, used a faulty respirator, and delayed his transfer to a hospital." *Sargeant*, 87 F.4th at 366 (citing *Carlson*, 446 U.S.

10

at 16 n.1). As noted, the Supreme Court authorized a damages remedy for failure to provide adequate medical treatment under the Eighth Amendment. *Ziglar*, 582 U.S. at 131 (citing *Carlson*, 446 U.S. at 19). On its face, Daddono's claim seems to fit the *Carlson* mold: it too is a *Bivens* claim brought under the Eighth Amendment for inadequate medical care. But it is not enough for the right at issue and the "mechanism of injury" to be the same as one of the original three *Bivens* cases, *id.*, at 139; "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 589 U.S. at 103.

Here, there are meaningful factual differences that convince the Court that Daddono's case presents a new *Bivens* context. *See Snowden*, 72 F.4th at 239 (noting factual distinctions can lead to a meaningful difference). First, this case involves an alleged ongoing failure to provide medical care, over the course of years, (*see generally*, Pl.'s Resp. to DSOF ¶¶ 34–101, 103–106 (describing treatment while incarcerated); Defs.' Resp. to PSOF ¶¶ 10–48 (same));[4] *see also Watkins v. United States*, No. 21 C 02045, 2023 WL 8527414, at *8 (N.D. Ill. Dec. 8, 2023) (finding "new context" where, among other things, plaintiff "alleged an ongoing failure to provide medical care" in comparison to Carlson's asthmatic episode), whereas *Carlson* was not provided medical care over the course of hours, and died as a result. *Carlson*, 446

---

[4] The Court understands that Daddono's contention is that he did not receive appropriate care from the doctors. (*See e.g.*, R. 209 at 37 ("[T]he Government's actions in this case constitute medical negligence[.]").) That is a factual dispute, but not the core issue here; the threshold question is whether a *Bivens* cause of action can be brought *at all*. Therefore, for the purposes of this portion of the analysis, the Court relies on the parties' undisputed facts to assess what parallels, if any, exist between this case and *Carlson*.

U.S. at 16 n.1. In addition, the record shows that Daddono's hepatitis C was consistently monitored to determine the appropriate course of action (*see, e.g.*, Pl.'s Resp. to DSOF ¶¶ 36–43; 51–53, 56, 62, 70, 105), whereas in *Carlson*, the plaintiff was ignored for many hours. 446 U.S. at 16 n.1. While a hepatitis diagnosis "will eventually shorten a patient's life," (R. 209 at 21), this abstract possibility is meaningfully different from the life-threatening asthma attack that could cause (and did cause) an immediate fatality.

Even if the facts presented substantially similar circumstances, other considerations counsel that Daddono's *Bivens* claim cannot move forward. Specifically, the "risk of disruptive intrusion by the Judiciary into the functioning of other branches" and the "presence of potential special factors that previous *Bivens* cases did not consider," *Ziglar*, 582 U.S. at 140, "cut against [Daddono] in a way that dissolves his claim after *Egbert*." *Sargeant*, 87 F.4th at 367. As to the former, the decisions about Daddono's hepatitis C care were informed by BOP policies and procedures specifically about hepatitis C. (*See, e.g.*, Pl.'s Resp. to DSOF ¶¶ 16–21, 81.) There was extensive rationale for deferral of treatment, based on the guidelines, (*id.* ¶¶ 49–50), and as noted, Daddono's circumstances were monitored throughout his time in federal custody. (*See, e.g., id.*, 53, 56, 58–59, 62–65, 70, 72–74, 91.) To allow a *Bivens* claim to proceed against the doctors, the Court would have to find that the doctors should have ignored BOP policies while treating Daddono. A *Bivens* remedy is not "a proper vehicle for altering an entity's policy." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73 (2001). Further, allowing a *Bivens* claim to proceed here would also

require the Court to determine things that it is "ill-positioned to assess" such as how BOP allocates its resources with respect to high-cost, new drugs with limited availability. *Sargeant*, 87 F.4th at 367. "The Supreme Court has warned that we 'likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*"—and that resulting uncertainty alone forecloses relief." *Id.* (quoting *Egbert*, 596 U.S. at 493). To find a *Bivens* claim under the circumstances presented in this case "would bring about at least some risk of intrusion." *Id.*

And as to the latter, there are "special factors that previous *Bivens* cases did not consider" at play here. *Ziglar*, 582 at 140. Specifically, "[s]ince *Carlson*, the Supreme Court has viewed alternative remedy programs as a special factor which *alone* can foreclose a *Bivens* claim." *Brooks v. Richardson*, No. 22 C 6738, 2024 WL 1376070, at *5 (N.D. Ill. Mar. 31, 2024) (citing *Egbert*, 596 U.S. at 494) (emphasis added). And fifteen years after *Carlson*, Congress passed the Prison Litigation Reform Act of 1995 ("PLRA") which requires federal prisoners to "exhaust any relevant grievance procedures before filing suit." *Sargeant*, 87 F.4th at 368 (citations omitted). The Administrative Remedy Program (ARP), through which inmates may file grievances, "provides [ ] another means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring." *Malesko*, 534 U.S. at 73. Under the Supreme Court's *Bivens* jurisprudence, the Court "must [ ] ask only whether a single reason suggests that Congress is better positioned to assess the need for a remedy or that Congress might not desire a new remedy. The PLRA and the Bureau of Prisons' grievance program

13

satisfy that low bar." *Sargeant*, 87 F.4th at 368. Given these considerations, Daddono's lawsuit presents a new *Bivens* claim.

### B.    Special Factors

Having concluded that Daddono's lawsuit presents a new *Bivens* claim, the Court asks whether there are "'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136.[5] As the Seventh Circuit has noted,

> This is why the Supreme Court remarked in *Egbert* that the two-step inquiry sometimes melds into a single step. The reason that a distinction might alter the cost-benefit balance struck in an original *Bivens* case (step one) can also be the reason why Congress might be better positioned to create a remedy in the hope of deterring unconstitutional conduct (step two).

*Sargeant*, 87 F.4th at 366 (citations omitted). At this step, the Court must ask "if there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate.'" *Egbert*, 596 U.S. at 496 (citations omitted).

Here, as discussed, the existence of the PLRA and the ARP demonstrate that the other branches have already spoken, and therefore judicial intrusion would be inappropriate. The Court must thus follow "the Supreme Court's instructions [which] tell[ ] [the Court] not to consider whether a *Bivens* action could work alongside an existing scheme or whether the alternative remedy completely compensates the

---

[5] As noted, Daddono did not address the second step of the *Bivens* analysis. "A person waives an argument by failing to raise it before the district court[.]" *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

victim." *Sargeant*, 87 F.4th at 368. In sum, although the *Bivens* trilogy theoretically lives on, the circumstances under which a plaintiff can expand them are increasingly limited. *Egbert*, 596 U.S. at 486 (collecting cases). Daddono's claims do not clear the high bar for *Bivens* actions. Therefore, summary judgment for the doctors is granted.[6]

## II.    FTCA CLAIM

The parties cross-move for summary judgment on Daddono's FTCA claim against the United States. The government's position is that relief under the FTCA is precluded by the "discretionary function" exception to the statute. 28 U.S.C. §2680(a); (R. 202 at 36.) Daddono counters that the discretionary function exception does not apply. (R. 209 at 29.) Moreover, Daddono argues that he is entitled to summary judgment on the FTCA claim because "[t]here can be no dispute of material fact that the Government committed medical negligence" under either Illinois or Indiana law. (*Id.* at 34–35.) The threshold issue for deciding whether the FTCA claim can go forward is whether the discretionary function exception applies here, so the Court will address that issue first.

"The FTCA permits suits against the United States for personal injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable to the plaintiff." *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)). However, the FTCA's prescription of government liability is subject to "various exceptions" including, as relevant here, the "discretionary

---

[6] Because a *Bivens* remedy is unavailable, the Court need not reach qualified immunity. (*See generally* R. 202 at 27–36; R. 206 at 22–28.)

function" exception. *United States v. Gaubert*, 499 U.S. 315, 322 (1991). The discretionary function exception states that the government is not liable for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* (quoting 28 U.S.C. § 2680(a)). This exception "covers only acts that are discretionary in nature, acts that 'involv[e] an element of choice.'" *Id.* (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). What matters is the "nature of the conduct, rather than the status of the actor[.]" *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984) (quotations omitted)). Above all, "[t]he purpose of this discretionary-function exception is to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Reynolds*, 549 F.3d at 1112 (quoting *Varig Airlines*, 467 U.S. at 814).

There are two components to determining whether the discretionary function exception applies. *Linder v. United States*, 937 F.3d 1087, 1089 (7th Cir. 2019). First, "the assertedly wrongful conduct must entail an element of judgment or choice," and second, "the discretion must be based on considerations of public policy." *Id.* (citing *Gaubert*, 499 U.S. at 322–23). As to the former, "[t]he requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful

option but to adhere to the directive.'" *Palay v. United States*, 349 F.3d 418, 427 (7th Cir. 2003) (quoting *Gaubert*, 499 U.S. at 322). As to the latter, "[w]hen established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* (quoting *Gaubert*, 499 U.S. at 324). Each element is addressed in turn.

### A.    Conduct Entailing an Element of Judgment or Choice

To determine whether the decisions regarding Daddono's treatment involved a discretionary act, the Court must examine the statute that governs the duties of the BOP, 18 U.S.C. § 4042. The statute directs that the BOP "shall . . . provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States[.]" *Id.* at § (a)(2). From the government's perspective, this mandate "leave[s] to the BOP's 'discretion how to accomplish those goals and are not sufficiently specific to render the [discretionary function exception] inapplicable." (R. 202 at 38 (citing *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997).) In contrast, Daddono focuses on the word "shall" in the statute to argue that there was no "discretion to allow [his hepatitis C] to remain untreated until it damaged his liver to such a degree to consider him a 'priority.'" (R. 209 at 30–31.) It is true "that this statute sets forth a mandatory duty of care[.]" *Calderon*, 123 F.3d at 950. "[I]t does not, however, direct the manner by which the BOP must fulfill this duty." *Id.* As the Seventh Circuit has explained, "[t]he statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfil their duty" under the

statute. *Id.* Therefore, the BOP's acts around the "safekeeping, care, and subsistence" of Daddono involved discretion.

### B. Considerations of Public Policy

Next, the Court determines whether the steps the doctors took to treat, or fail to treat, Daddono's hepatitis C were grounded in considerations of public policy. The government contends that Daddono's FTCA claim "attacks BOP's hepatitis C treatment guidelines," which are "precisely the kind of judgment the [discretionary function exception] was designed to shield." (R. 202 at 39.) Daddono counters that the doctors' treatment decisions do not involve "political, social and economic judgment" but rather "medical judgment." (R. 209 at 31.) Pointing to another case decided in this district, *Stacy v. United States*, No. 19 C 301, 2021 WL 3849673 (N.D. Ill. Aug. 27, 2021), Daddono relies on that decision's explanation that "while the discretionary function exception is broad, it is not broad as to 'swallow up medical-decision making.'" (R. 209 at 32 (quoting *Stacy*, 2021 WL 3849673, at *3).)

*Stacy*, however, is distinguishable. In *Stacy*, the plaintiff sued the government for failing to provide him with recommended hip replacement surgery while he was in custody; the recommendation was that surgery happen within a month of when he was first evaluated, but it did not happen at all. 2021 WL 3849673, at *1. The court acknowledged that the BOP "may have exercised an element of discretion or judgment when they decided not to allow the surgery," but that based on the record before it, the decision of whether to treat the plaintiff was solely a medical one, not a policy one. *Id.* at *3. Therefore, the FTCA claim could go forward.

Here, the record evidences a mix of medical *and* policy judgments at issue. It is undisputed that in 2013 the FDA approved "DAA" drugs which were "highly effective in treating hepatitis C and which initially cost $90,000 to $100,000 per patient." (Pl.'s Resp. to DSOF ¶ 13.) Thereafter, AASLD provided guidance on how to treat hepatitis C in light of these new drugs, initially allowing that prioritization of treatment was "necessary." (*Id.* ¶ 14.) The BOP adopted guidance for its facilities on the treatment of hepatitis C based on the AASLD's recommendations; it kept the practice of prioritization in place even after AASLD dropped it from its recommendations "due to its limited resources." (*Id.* ¶ 16.) "The limited resources that led to the BOP to continue its practice of prioritization included both funding and availability of the medication" as well as the "'exorbitant' cost of the medication." (*Id.* ¶¶ 17–18.) Indeed, "the cost of treating every patient with hepatitis C in BOP custody would have been billions of dollars." (*Id.* ¶ 20.) "The team of physicians at the BOP's central office formulates the BOP's clinical practice guidelines," relying on organizations such as the AASLD's recommendations. (*Id.* ¶ 26.) And initially, the BOP "used four priority levels" but reduced that to three in 2016, ultimately eliminating them in 2021. (*Id.* ¶ 28.) The Marshals followed BOP guidance as well; Wolf, the Marshals Services' medical director and author of the policies and procedures for health care for Marshals Service prisoners, followed BOP guidelines because it "must 'make decisions about who [they] can treat with [their] limited funding resources,' whereas the AALSD 'does not.'" (*Id.* ¶¶ 22–23 (citations omitted).)

While in the custody of the Marshals from April 2015 through early October 2015, *i.e.*, while the AASLD included prioritization in its recommendations (*see id.* ¶ 14), Daddono was evaluated by an outside liver specialist who recommended he engage in treatment for his hepatitis C. (*Id.* ¶ 36.) The request was denied because Daddono's clinical status and lab results placed him, per BOP policy, at a BOP criteria level three or four. (*See generally, id.* ¶¶ 37–40.) The outside liver specialist endorsed the Marshals' approach to Daddono's treatment. (*Id.* ¶¶ 42–43.) Therefore, the undisputed evidence is  that  Daddono's request for hepatitis C medication was "deferred" based on these considerations. (*Id.* ¶¶ 49–50.)

Likewise, while Daddono was in BOP custody from October 2015 through October 2016, BOP made its own assessments of Daddono's clinical status. (*See generally, id.* ¶¶ 51–53.) "BOP treaters are required to follow the BOP's hepatitis C guidelines." (*Id.* ¶ 81.) The treatment plan included monitoring Daddono, conducting labs every six months, and conducting follow-up visits. (*Id.* ¶ 56.) During a visit with Nowakowski in February 2016, Daddono was informed that his lab tests indicated that his liver numbers were "normalized"; it "reinforced [ ] Nowakowski's plan to monitor Daddono." (*Id.* ¶ 62.) When Daddono reasserted his request for medication in June 2016, he was told that they were "following the clinical practice guidelines, procedures to get approval." (*Id.* ¶ 70 (citations omitted).) While allegedly Nowakowski told Daddono that he should receive medication under the AASLD guidelines as opposed to "being 'prioritized' under the BOP guidelines," (*id.* ¶ 75), the BOP's "strict guidelines" during this time was that medication was only provided to

those at priority levels one or two." (*Id.* ¶ 76). Daddono was a priority level four, (*id.* ¶ 77), and the BOP's guidance at the time was to "follow and monitor patients who were in priority levels 3 and 4 and to submit requests for medication for patients who were in priority levels 1 and 2." (*Id.* ¶ 79.) The BOP and Marshals doctors followed BOP policy. (*Id.* ¶¶ 82, 84, 90.) And "the decision by the providers [ ] was *to treat* Daddono, but the BOP's central office determines the *when* part based on priority criteria." (*Id.* ¶ 91 (emphasis in original) (citations omitted).)

Finally, during Daddono's time in BOP custody from 2018 through 2019, he was diagnosed with cirrhosis. (*Id.* ¶ 104.) The BOP physicians there referred Daddono for hepatitis C medication, which was approved. (*Id.* ¶ 105.) Because starting treatment would have required Daddono to stay in custody longer than his sentence required, and because it would have required him to stop taking other medication, he declined. (*Id.* ¶ 106.)

As demonstrated, the record is rife with examples of the doctors making a mix of medical *and* policy judgments, and monitoring Daddono's condition, while simultaneously following their obligations under BOP policies. *See Linder*, 937 F.3d at 1090 ("[The] Marshal [ ] did not make things up on the spur of the moment; he consulted and attempted to follow the rules."). And the record is clear that the BOP policies were promulgated with both AASLD guidelines and medical judgment in mind, but also the economic considerations of funding and availability of medication. (*See, e.g.*, Pl.'s Resp. to DSOF ¶¶ 16–21.) In other words, unlike in *Stacy*, the decisions of the BOP officials were not solely ones of medical judgment, *Stacy*, 2021 WL

3849673, at *3, but also ones that took into account, and reflected, economic policy considerations. Even "if a regulation or directive is invalid," which Daddono seems to believe by asserting that the doctors "did not have discretion to allow [ ] Daddono's [hepatitis C] to remain untreated until it damaged his liver to such a degree to consider him a 'priority,'" (*see* R. 209 at 30–31), or "the discretion conferred under [the regulation or directive] has been abused," "there is no liability" under the FTCA. *Linder*, 937 F.3d at 1090. The actions by the doctors "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Therefore, the second element of the discretionary function test is met.

The Court does not reach this decision lightly. It carefully reviewed the record, and is mindful of the progression of Daddono's condition, as laid out in the proposed Fifth Amended Complaint. (*See* R. 225–1.) However, the coverage of the FTCA is "limited," *Linder*, 937 F.3d at 1090, and does not apply here. Accordingly, the defendants' motion for summary judgment as to Daddono's claim under the FTCA is granted.[7]

---

[7] Because the Court grants the defendants' motion for summary judgment as to Daddono's FTCA claim based on the discretionary function exception, it does not reach the arguments made by the parties regarding exhaustion of administrative remedies against the Marshals Service. (*See generally* R. 202 at 41–42; R. 209 at 32–34.)

## CONCLUSION

The defendants' motion for summary judgment [201] is granted. The plaintiff's motion for partial summary judgment [208] is denied. The plaintiff's motion to file an amended complaint [225] is denied as moot. Civil case terminated.

Date: December 11, 2024

JEREMY C. DANIEL
United States District Judge